**Ninth Circuit Court of Appeals No. 26-3725**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

---

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**-vs-**

**RYAN CHRISTOPHER WILLIAMS,**

**Defendant-Appellant**

---

# OPENING BRIEF OF DEFENDANT-APPELLANT

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA, HELENA DIVISION
DISTRICT COURT NO. CR 25-15-H-BMM
HONORABLE BRIAN M. MORRIS
UNITED STATES DISTRICT COURT JUDGE, PRESIDING

RACHEL JULAGAY
Federal Defender, District of Montana
***CHAD WRIGHT**
Assistant Federal Defender
Federal Defenders of Montana
50 West 14th Street, Suite 1
Helena, MT 59601
Telephone: (406) 449-8381

SUBMITTED: October 1, 2026

***Counsel for Defendant-Appellant**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ....................................................................i-ii

TABLE OF AUTHORITIES.................................................................... iii-vi

I. STATEMENT OF JURISDICTION............................................................ 1

A. Subject Matter Jurisdiction in the District Court................................ 1

B. Jurisdiction in the Court of Appeals .................................................. 1

C. Appealability of District Court Order and Timeliness of the Appeal .... 2

II. BAIL STATUS ........................................................................................ 2

III. STATEMENT OF ISSUES ....................................................................... 2

A. Ryan Williams reasonably relied on the Montana legislative command giving him license to continue to carry his concealed firearm on the roads passing through the 1,000-foot buffer surrounding a newly built high school near his home......................... 2

B. The Gun Free School Zones Act too broadly prohibited and punished Ryan Williams from entering the 1,000-foot buffer school zones with his lawfully possessed firearm leading to arbitrary enforcement of his individual right to possess firearms under the Second Amendment......................................................... 2

IV. STATEMENT OF THE CASE.................................................................. 2

V. FACTUAL BACKGROUND .................................................................... 4

VI. SUMMARY OF THE ARGUMENTS ........................................................ 9

VII. STANDARD OF REVIEW ..................................................................... 11

VIII. ARGUMENTS........................................................................................ 11

A. Ryan Williams reasonably relied on the Montana legislative command giving him license to continue to carry his concealed firearm on the roads passing through the 1,000-foot buffer surrounding a newly built high school near his home. ....................... 11

1. The Gun Free School Zone Act is defined by its exception. .......................................................................................... 12

2. Montana's legislative response to the GFSZA. ........................... 14

3. This Court's ruling in *United States v. Metcalf*. .......................... 15

4. Williams was subject to the same unique Montana law allowing possession of a firearm within the 1000-foot school buffer zone.......................................................................... 18

B. The Gun Free School Zones Act too broadly prohibited and punished Ryan Williams from entering the 1,000-foot buffer school zones with his lawfully possessed firearm leading to arbitrary enforcement of his individual right to possess firearms under the Second Amendment.......................................................... 20

1. The constitutional right to individual firearms possession. ........................................................................................ 20

2. The *Bruen* historical analysis. .................................................... 22

3. As-applied constitutional challenges to firearms restrictions must consider the individual circumstances. ................. 26

IX. CONCLUSION ............................................................................................ 27

X. STATEMENT OF RELATED CASES ...................................................... 29

XI. CERTIFICATE OF COMPLIANCE ............................................................ 30

XII. CERTIFICATE OF SERVICE ..................................................................... 31

# TABLE OF AUTHORITIES

**Cases** **Pages**

*Ayotte v. Planned Parenthood of N. New England*,
546 U.S. 320 (2006) ........ 26

*B & L Prods., Inc. v. Newsom*,
104 F.4th 108 (9th Cir. 2024) ........ 23

*Both Heller and McDonald v. City of Chicago, Ill.*,
561 U.S. 742 (2010) ........ 24

*Bouie v. City of Columbia*,
378 U.S. 347 (1964) ........ 17, 19

*Buchanan v. Alexander*,
919 F.3d 847 (5th Cir. 2019) ........ 26

*D.C. v. Heller*,
554 U.S. 570 (2008) ........ 10, 20, 21, 22

*Freedom Path, Inc. v. Internal Revenue Serv.*,
913 F.3d 503 (5th Cir. 2019) ........ 26

*Griffith v. Kentucky*,
479 U.S. 314 (1987) ........ 19

*McBoyle v. United States*,
283 U.S. 25 (1931) ........ 19

*McNally v. United States*,
483 U.S. 350 (1987) ........ 19

*New York Rifle and Pistol Association, Inc. v. Bruen*,
597 U.S. 1 (2022) ........ 3, 22, 23-24, 24

*New York State Rifle and Pistol Association, Inc. v. Bruen*,
142 S. Ct. 2111 (2022) ........ 10

*Range v. Att'y Gen. United States*,
124 F.4th 218 (3rd Cir. 2024) (en banc) ........ 26-27

*Rehaif v. United States*,
588 U.S. 225 (2019) ........ 17

*Teter v. Lopez*,
125 F.4th 1301 (9th Cir. 2025) .............................................................. 22

*United States v. Allam*,
140 F.4th 289 (5th Cir. 2025) ...................................................... 23, 27

*United States v. Bartley*,
9 F.4th 1128 (9th Cir. 2021) .................................................................. 11

*United States v. Duarte*,
137 F.4th 743 (9th Cir. 2025) (en banc) ................................................. 26

*United States v. Hungerford*,
465 F.3d 1113 (9th Cir. 2006) ................................................................ 27

*United States v. Metcalf*,
156 F.4th 871 (9th Cir. 2025) ....................................... 3, 13, 15, 16, 17, 18, 20

*United States v. Mitchell*,
652 F.3d 387 (3d Cir. 2011) .................................................................. 26

*United States v. Olander*,
572 F.3d 764 (9th Cir. 2009) ................................................................. 11

*United States v. Rahimi*,
602 U.S. 680 (2024) ........................................................................ 20, 23

*United States v. Rybicki*,
354 F.3d 124 (2nd Cir. 2003) ................................................................ 19

*United States v. Schafer*,
625 F.3d 629 (9th Cir. 2010) ................................................................. 18

*United States v. Stennerson*,
150 F.4th 1276 (9th Cir. 2025) .............................................................. 22

*Wolford v. Lopez*,
609 U.S. 185 (2026) ........................................................... 10, 24, 25, 26

///

///

///

**Statutes and Rules**

Federal Rules

Rule 4(b)(1)(A) .... 6, 2
Rule 11(a)(2) .... 7
Rule 25 .... 31
Rule 28 .... 7, 29
Rule 32(a) .... 30

United States Code

18 U.S.C. §922(g)(8) .... 25
18 U.S.C. §922(q) .... 10
18 U.S.C. §922(q)(2) .... 13
18 U.S.C. §922(q)(2)(A) .... 2, 3, 10, 25
18 U.S.C. §922(q)(2)(B) .... 14
18 U.S.C. §922(q)(B)(ii) .... 3
18 U.S.C. §922(q)(2)(B)(iii) .... 10, 13, 25, 27
18 U.S.C. §922(q)(2)(B)(iii)(I) and (II) .... 13, 27, 28
18 U.S.C. §922(q)(2)(B)(iv) .... 13
18 U.S.C. §922(q)(2)(B)(vi) .... 13
18 U.S.C. §922(q)(2)(B)(vii) .... 13
18 U.S.C. §922(n) .... 1, 2, 3, 7
18 U.S.C. §922(q) .... 1, 20
28 U.S.C. §1291 .... 7, 1

Montana Code Annotated

Mont. Code Ann. §5-5-107 .... 16
Mont. Code Ann. §5-5-109 .... 16
Mont. Code Ann. §5-5-113 .... 16
Mont. Code Ann. §45-8-316(3) .... 4, 6, 14, 18
Mont. Code Ann. §45-8-360 .... 3, 9, 14, 15

Mont. Code Ann. §45-8-361 .......... 14
Mont. Code Ann. §45-7-302 .......... 7
Mont. Code Ann. §45-7-303 .......... 7

United States Constitution
U.S. Const. amend. II .......... 7, 20
U.S. Const. amend. V .......... 7

## ABBREVIATIONS

| | |
|---|---|
| Excerpts of Record | "__-ER-__" |
| Presentence Report | "PSR" |

**Ninth Circuit Court of Appeals No. 26-3725**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

-vs-

RYAN CHRISTOPHER WILLIAMS,

Defendant-Appellant

**OPENING BRIEF OF DEFENDANT-APPELLANT**

# I. STATEMENT OF JURISDICTION

## A. Subject Matter Jurisdiction in the District Court

The district court had jurisdiction over this case because the grand jury indicted Defendant-Appellant Ryan Christopher Williams (Williams), with Possession of a Firearm within a School Zone, in violation of 18 USC §922(q) (1-ER-215-216).

## B. Jurisdiction in the Court of Appeals

Williams appeals from the final judgment imposed by the district court. This Court's jurisdiction arises under 28 USC §1291.

///

### C. Appealability of District Court Order and Timeliness of the Appeal

Pursuant to a plea agreement, Williams entered a conditional plea on February 3, 2026. (1-ER-34-42) The district court sentenced Williams on June 8, 2026. A written judgment was filed the same day (1-ER-6-11). Wiliams filed his notice of appeal on June 13, 2026 (1-ER-112-113) in compliance with Rule 4(b)(1)(A) of the Federal Rules of Appellate Procedure.

## II. BAIL STATUS

Williams is currently serving a probationary sentence in East Helena, Montana.

## III. STATEMENT OF THE ISSUES

A. Ryan Williams reasonably relied on the Montana legislative command giving him license to continue to carry his concealed firearm on the roads passing through the 1,000-foot buffer surrounding a newly built high school near his home.

B. The Gun Free School Zones Act too broadly prohibited and punished Ryan Williams from entering the 1,000-foot buffer school zones with his lawfully possessed firearm leading to arbitrary enforcement of his individual right to possess firearms under the Second Amendment.

## IV. STATEMENT OF THE CASE

On September 3, 2025, an Indictment was filed in the District of Montana, Helena Division, charging Williams with a single count of violating 18 U.S.C. §922(q)(2)(A) for allegedly possessing a firearm within a school zone. Williams was arraigned on November 17, 2025, after which he was released on conditions during the pendency of his case.

Three weeks after Williams was indicted, this Court issued its decision in *United States v. Metcalf*, 156 F.4th 871, 885 (9th Cir. 2025), reversing the conviction of another Montana gunowner under §922(q)(2)(A). The gunowner's home was across the street from an elementary school and he was patrolling outside his home with a shotgun. The lower court decision in *Metcalf* had been on appeal to the Ninth Circuit since August 6, 2024. Williams filed a motion to dismiss the Indictment because, as set forth in *Metcalf*, there was a plausible reading that Mont. Code Ann. §45-8-360 licensed and verified Williams to possess a firearm under the Gun-Free School Zones Act (GFSZA). More specifically, Williams argued that he reasonably believed he met the exception at 18 U.S.C. §922(q)(B)(ii) allowing possession of a firearm within the school zone 1000-foot buffer area if, as the plain language of the Montana statute put forth, he was a person licensed and verified by the Montana Legislature. (1-ER-212-214)

Williams filed a second motion to dismiss under *New York Rifle and Pistol Association, Inc. v. Bruen,* 597 U.S. 1 (2022). In his *Bruen* motion to dismiss, Williams argued the firearms prohibition of §922(q)(2)(A) was too broad as applied to his ability to travel from his home while he lawfully carried a firearm to access the busy thoroughfare that crossed the newly built school's 1000-foot buffer zone (1-ER-194-201).

///

On December 12, 2025, the district court denied both of Williams' motions to dismiss (1-ER-88-108). On February 6, 2026, Williams pled guilty to the GFSZA charge while reserving his right to appeal the district court's denial of his motion to dismiss under Rule 11(a)(2) of the Federal Rules of Criminal Procedure. On June 8, 2026, Williams was sentenced to five years of probation (1-ER-6-11).

Williams submits the following brief challenging district court's refusal to apply *Metcalf* and failure to recognize the unique circumstances that would make application of the GFSZA unconstitutional as applied to his otherwise lawful assertion of his Second Amendment right to carry a firearm for protection.

## V. FACTUAL BACKGROUND

Ryan Williams ran a solo automotive repair shop on his property in the same subdivision where he lived. He also stored his small airplane on the property. He had lived there for over 25 years. He held a special affinity for the subdivision. He served on the subdivision's water board and had many nearby customers. (PSR ¶28) He also knew the dangers of being a gay man in rural Montana running a shop by himself where he kept expensive tools and cash. He had previously applied for and obtained a concealed carry permit through 2016 until the Montana Legislature removed the requirement to have a permit to conceal carry a firearm in 2021. Mont. Code Ann. §45-8-316(3). On May 1, 2025, he was wearing a small firearm in a chest holster under his jacket when he went to grab breakfast at McDonald's and bring it back to his shop

to meet his stepfather for the workday.

In 2020, the East Helena community opened a brand-new high school across the main road from Williams' subdivision. The newly constructed high school enveloped Williams' subdivision and meant he had to cross the 1000-foot buffer zone created by the GFSVA nearly every time he left his home:




(1-ER-148) The new school also increased the traffic in the area.

On the morning of May 1, 2025, to avoid the school zone speed limits on the main road from his house to school, a seventeen-year-old student cut through

Williams' subdivision at a high rate of speed.[1] Returning back to his shop, Williams followed and then pulled in front of the student when the student reached the subdivision side of the main road across from the huge school parking lot. Williams maintained that he was still wearing his small, chest-holstered firearm when he got out of the car to tell the student he was driving too fast. The student drove to school and told school personnel that Williams approached the car pointing a gun with his arm fully outstretched from the moment Williams got out of his car. When the officer asked the student how Williams was supposedly holding the gun, the student demonstrated by fully extending his arm and pointing.[2] He said Williams told him "You can't drive that way." *Id.*

When interviewed outside his home later that same morning, Williams admitted pulling in front of the student to stop and warn him about speeding through the subdivision but Williams vehemently denied unholstering his gun. Williams told law enforcement his gun was still holstered. He mistakenly thought it was zipped up out of sight under his jacket. Even in its holster, the gun is still visible as a silver and black firearm. Police canvassed the neighborhood to see if anyone else had seen or recorded

---

[1] Williams, who also races cars, estimated the student was going 60 to 70 miles per hour. The student only admitted that he was going 35 miles pr hour. (PSR ¶27.)

[2] The student's demonstration can be viewed in Exhibit E pursuant to CR 27-14 (and filed under seal pursuant to CR 27-13).

Williams and the student. The sheriff's department found one eyewitness.

Michelle Thompson watched the interaction between Williams and the student because it took place in front of her house. She called law enforcement in response to the earlier sheriff canvassing of the subdivision. That morning, Corporal Cody Criner informed her brother an individual had pulled a gun on another person.[3] Later in the day, when Corporal Criner returned to the house, Ms. Thompson accurately described Williams as a dark-haired man, age 40-45, wearing dark clothing and a baseball cap. She said Williams got out of a black four-door sedan and walked over to the other small silver sedan the student was driving. The sedans were parked on either side of her driveway, 655 feet away from the corner of the high school:




(1-ER-70) She did not hear yelling and thought it was somebody's father talking to

[3] Corporal Criner's bodycam interview with Ms. Thompson's brother was provided to the defense on December 11, 2025.

their kid. When asked about firearms she said: "I didn't see a weapon or anything like that."[4]

After a search of his property and seizure of the gun, Mr. Williams was arrested on a state charge of assault with a weapon.[5] When interviewed at the jail by an ATF Agent Williams acknowledged that he had a firearm with him and that he kept other firearms locked in a safe at home. (PSR ¶29). Four months later he was charged in federal court with the GFSZA violation.

At the evidentiary hearing on his motion to dismiss, the district court questioned the government why Williams, who had lived in the neighborhood for years before the high school was built, was suddenly in violation of the law. 1-ER-136. The government said Williams was on notice because the *Metcalf* district court decision had been out for nearly a year when Williams stopped the student speeding through his neighborhood. The district court agreed that Williams could have researched the decision and found the *Metcalf* lower court ruling. 1-ER-131. Williams responded that the *Metcalf* district court decision was appealed and could not serve as the trigger to inform Williams that he was out of compliance with Montana law. 1-ER-138. The

---

[4] The full bodycam interview of Michelle Thompson can be viewed at Exhibit D.

[5] On February 17, 2026, Williams entered into a deferred prosecution agreement where he did not admit his guilt but agreed there was probable cause to charge him. In exchange, the State agreed not to prosecute if he remained law abiding for three years (PSR ¶75).

district court denied the motion to dismiss, focusing on Williams individual alleged conduct.

After the motions hearing, but before sentencing, Williams was provided Thompson's eyewitness report of the interaction between Williams and the student. Williams submitted the bodycam footage documenting Thompson's eyewitness account and asked the district court to reconsider its decision on the motion to dismiss based on the evidence contradicting the student's claim that Williams approached with an outstretched arm holding a gun. (1-ER-62-87). The Government responded that the late disclosure was not intentional. (1-ER-43). Before the district court ruled on his discovery motion, Williams accepted a plea agreement that preserved his right to appeal the district court's denials of his motions to dismiss. (1-ER-34).

## VI. SUMMARY OF THE ARGUMENTS

Congress delegated to the States the ability to define who could possess firearms within the 1,000-foot buffer zones surrounding schools. Montana immediately chose to act upon that invitation by prohibiting the possession of firearms inside schools but issuing verified licenses to all lawful gunowners to possess firearms within the GFSZA buffer zone. Williams could not have known that, despite the plain language of Mont. Code Ann. §45-8-360, he could not travel with his holstered firearm on the public roads 655 feet away from the newly built high school in his subdivision. As this Court found in *United States v. Metcalf*, there exists a plausible reading to say

the Montana legislature investigated and verified the necessary licenses to trigger the exception in §922(q)(2)(B)(ii) of the GFSZA. The federal district court's decision to the contrary in *Metcalf* was on appeal and not yet final when Williams entered the school zone with his concealed firearm, so he could still rely on the plain language of the Montana licensure statute  Limiting this Court's ruling in *Metcalf* to only one person would be the very definition of arbitrary enforcement of the GFSAZ. Williams' conviction presents similarly unique circumstances and must be reversed because of the same lack of fair notice.

More broadly, based on the analytical framework established by *New York State Rifle and Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the firearms prohibition of §922(q)(2)(A) does not apply to Williams as he otherwise lawfully carried a firearm on a busy thoroughfare that crossed a school zone. The firearm storage requirements in the GFSZA mirror those in *D.C. v. Heller*, 554 U.S. 570, 580-81, 128 S. Ct. 2783, 2791, 171 L. Ed. 2d 637 (2008) and *Wolford v. Lopez*, 609 U.S. 185, 203, 146 S. Ct. 2032, 225 L. Ed. 2d 494 (2026). The 1,000-foot buffer zone meant Williams could not leave his home without having to disable any firearm he carried defeating his right to protect. Williams' conviction under §922(q) should be dismissed because, as applied, his individual conduct falls within the protection of the Second Amendment.

///

## VII. STANDARD OF REVIEW

A district court's decision about whether to dismiss an indictment based on its interpretation of a federal statute is reviewed *de novo*. *United States v. Olander*, 572 F.3d 764, 766 (9th Cir. 2009). The district court's denial of a motion to dismiss the indictment based on constitutional challenges is also reviewed *de novo*. *United States v. Bartley*, 9 F.4th 1128, 1131 (9th Cir. 2021).

## VIII. ARGUMENTS

### A. Ryan Williams reasonably relied on the Montana legislative command giving him license to continue to carry his concealed firearm on the roads passing through the 1000-foot buffer surrounding a newly built high school near his home.

Running his auto repair business on his own property created some unique risks for Williams. First, his shop was fully outfitted with the necessary and specialized tools. Second, many of his customers paid in cash. To defend his business, and himself, Williams had long carried a firearm and obtained a concealed carry permit in Montana. Two factors then converged to put his Second Amendment rights in jeopardy. First, a new high school was built on a major throughfare near his home. Second, the Montana Legislature did away with the requirement to obtain a permit to conceal carry a firearm. Applying constitutional avoidance and lenity principles, Williams could rely on Montana law to reasonably believe he met the licensure exception in the GFSZA.

### 1. The Gun Free School Zone Act is defined by its exceptions.

The Gun Free School Zone Act was enacted to allow numerous exceptions to the prohibition against possessing guns within the 1000-foot buffer zone. The GFSZA states:

> (2)
>
> (A) It shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone.
>
> (B) Subparagraph (A) does not apply to the possession of a firearm—
>
> (i) on private property not part of school grounds;
>
> (ii) if the individual possessing the firearm is licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license;
>
> (iii)that is—
>
> (I) not loaded; and
>
> (II) in a locked container, or a locked firearms rack that is on a motor vehicle;
>
> (iv) by an individual for use in a program approved by a school in the school zone;
>
> (v) by an individual in accordance with a contract entered into between a school in the school zone and the individual or an employer of the individual;

> (vi) by a law enforcement officer acting in his or her official capacity; or
>
> (vii) that is unloaded and is possessed by an individual while traversing school premises for the purpose of gaining access to public or private lands open to hunting, if the entry on school premises is authorized by school authorities.

18 U.S.C. §922(q)(2). Some of these legislative exceptions to the overall prohibition against gun possession within a school zone may seem obvious, such as allowing law enforcement to possess firearms while acting in their official capacity. §922(q)(2)(B)(vi). Less obvious exceptions exist, such as allowing hunters to traverse the buffer zone with the approval of school officials. §922(q)(2)(B)(vii) Or, the exception created for rural states, like Montana, where the school can authorize firearms on school grounds as part of school shooting programs. §922(q)(2)(B)(iv). The first exception applicable exception to Williams' case ceded local decision making to define who could lawfully carry guns within a school zone. §922(q)(2)(B)(ii). As addressed in *Metcalf,* Congress delegated to the States a licensure process to possess firearms within a school zone. *United States v. Metcalf*, 156 F.4th 871, 880 (9th Cir. 2025). The second applicable exception to Williams' case requires any firearm in a vehicle travelling through the 1,000-foot school buffer zone to be unloaded and in a locked container or rack. §922(q)(2)(B)(iii)(I) and (II). The numerous exceptions make the notice requirements more susceptible to confusion and uneven enforcement of the GFSZA.

### 2. Montana's legislative response to the GFSZA.

Seizing on the invitation from Congress, in 1995, Montana enacted a licensing provision meant to comply with the licensure provision in §922(q)(2)(B) of the GFSZA. In its entirety, the Montana provision states:

> **Establishment of individual licensure.** In consideration that the right to keep and bear arms is protected and reserved to the people in Article II, section 12, of the Montana constitution, a person who has not been convicted violent, felony crime and who is lawfully able to own or to possess a firearm under the Montana constitution is considered to be individually licensed and verified by the state of Montana within the meaning of the provisions regarding individual licensure and verification in the federal Gun-Free School Zones Act.

Mont. Code Ann. §45-8-360. The Montana statute makes it clear that Montana Legislature's goal was to comply with the GFSZA. Montana continued to prohibit firearm possession, except for law enforcement personnel and school marshals, in school buildings. Mont. Code Ann. §45-8-361. Montana's assertion after the enactment of the GFSZA was that individual gunowners in Montana are considered qualified, if they meet certain requirements. More recently, the Montana Legislature did away with the requirement for a separate licensure process for people who wanted to carry a concealed weapon relying on the concept of "constitutional carry." Mont. Code Ann. §45-8-316(3).

When he approached the student, Williams had not been convicted of any felony crime and was lawfully able to own a firearm. Under this long-standing Montana

statute, he was "licensed and verified" to enter the school buffer zone set by the GFSZA. Congress has deferred to state determinations and state findings when concluding whether federal firearms offenses and exceptions are satisfied. *Metcalf*, 156 F.4th at 880 *citing Caron v. United States*, 524 U.S. 308, 313, 118 S.Ct. 2007, 141 L.Ed.2d 303 (1998). Montana's licensure process Mont. Code Ann. §45-8-360 is unique, and no other states have adopted a similar approach. *Metcalf*, 156 F.4th at 885.

**3. This Court's ruling in *United States v. Metcalf*.**

The convergence of Montana's broad initial GFSZA licensure provision and the newer expansion of open carry rights in Montana created the situation in *Metcalf*. Metcalf had been patrolling his property across the street from an elementary school with a shotgun because of threats made to him and his mother. State law and federal law enforcement officials were giving conflicting advice about Metcalf's ability to leave his property while armed while openly carrying a firearm. He was convicted under the GFSZA when he left his property with the shotgun. On appeal, this Court held, that under plausible reading of the GFSZA, Metcalf lacked fair notice that his Montana license did not comply with the GFSZA's state license exception which warranted dismissal of the indictment. *Metcalf*, 156 F.4th at 871.

This Court noted that background checks are not the only way to verify someone is qualified to hold a license. *Id.* at 878 *citing United States v. Tait*, 202 F.3d 1320, 1324 (11th Cir. 2000) (rejecting government's argument that Alabama's verification

was inadequate because it did "not require its licensing agents to conduct background checks"). This Court explained that verify can also mean affirm. The 1995 Montana Legislature affirmed that lawful gun owners in Montana were qualified to have a license under the GFSZA. *Id.* at 879. The 1995 Montana Legislature also met the federal definition of a local law enforcement agency:

> **(36)** The term "local law enforcement authority" means a bureau, office, department or other authority of a State or local government or Tribe that has jurisdiction to investigate a violation or potential violation of, or enforce, a State, local, or Tribal law.

*Id. citing* 18 U.S.C. §921(a)(36). Finally, Montana law does indeed vest the state legislature with investigative authority. *Id.* at 879-80 *citing* Mont Code Ann. §5-5-106. An entire legislative audit division is authorized to investigate financial crimes ranging from embezzlement to misuse of state equipment.[6] To assist its investigation it employs dedicated staff and can use subpoena powers to call witnesses. Mont. Code Ann. §5-5-107. Failure to comply with these legislative instigative processes can lead to direct referral for criminal sanctions. Mont. Code Ann. §§5-5-109 and 113.

In overturning Metcalf's conviction, this Court joined the Eleventh Circuit in finding that Congress deferred to state licensing requirements as part of the GFSZA. Metcalf, 156 F.4th at 880 *citing Tait*, 202 F.3d at 1324. It held that Metcalf's reading of the license exception is consistent with Congress's repeated deference to states'

[6] *See* https://www.legmt.gov/lad/about

findings on federal firearms law. With a plausible reading of the GFSZA licensing requirement and having been told by the Montana Legislature that he had a license, this Court held that Metcalf had not received "fair warning ... in language that the common world will understand," with which the rule of lenity is concerned." *Id.* at 883 *quoting McBoyle v. United States*, 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931); *and Bouie v. City of Columbia*, 378 U.S. 347, 351, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964) ("The ... principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.")

Finally, this Court turned to United States Supreme Court's recent holding in *Rehaif v. United States*, 588 U.S. 225, 233, 139 S. Ct. 2191, 204 L. Ed. 2d 594 (2019) to emphasize that it is the defendant's *status*, not his conduct alone, that makes the difference with regard to lawful gun possession. Without knowledge of prohibited status, a defendant may lack the intent needed to make his behavior wrongful. *Id.* Metcalf had a license from the Montana Legislature to possess a firearm within the 1000-foot GFSZA buffer zone. Even if his license was invalid under the GFSZA, his possession of the shotgun on the sidewalk outside his home and across from the elementary school was entirely innocent. This Court reversed because upholding the

district court conviction violated the scienter principals in *Rehaif. See, Metcalf*, 156 F.4th at 885.[7]

**4. Williams was subject to the same unique Montana law allowing possession of a firearm within the 1,000-foot school buffer zone.**

Williams was in the same position as Metcalf. He used to have concealed carry permit, but after 2021 the need to get a permit was no longer necessary. Mont. Code. Ann §45-8-316(3). He wore a firearm to protect himself, his home and his business. East Helena High School was built recently and the 1000-foot buffer zone closed off the routes he would take to enter and exit his subdivision. There was no signage warning Williams when he crossed through the GFSZA buffer area.

Unlike *Metcalf*, Williams did not receive direct advice from law enforcement about his ability to possess a firearm when he entered the 100-foot school buffer zone. However, whether he received advice from state officials on federal firearms law is irrelevant. *United States v. Schafer*, 625 F.3d 629, 637-38) (9th Cir. 2010).

Even without law enforcement advice, Williams did not receive fair warning that he was in violation of the GFSZA. The general public is not required to perform the "lawyer-like" task of statutory interpretation by reconciling the text of separate

---

[7] It is interesting that the government emphasized in district court that state law enforcement had told Metcalf what he was doing was not illegal. The government often cites the legal principal that state officials advise on federal law is irrelevant State authority not relevant or necessary. *United States v. Schafer*, 625 F.3d 629, 637 (9th Cir. 2010).

documents. *United States v. Rybicki*, 354 F.3d 124, 158 (2*nd* Cir. 2003), Jacobs, Circuit Judge, et al., *dissenting* and *citing* cases. *United States v. Brumley*, 116 F.3d 728, 745 (5*th* Cir. 1997) E. Grady, Circuit Judge, et al, *dissenting* (After Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987) "burden [was] on Congress to put down in statutory form" changes wrought by the *McNally* decision). Nor did the district court's decision in Metcalf put Williams on notice that he could not take his legally possessed firearm into the school zone. Metcalf immediately appealed the district court's ruling, so the conviction and the ruling it was based on were not yet final when Williams stopped in the school buffer zone on May 1, 2025. *Griffith v. Kentucky*, 479 U.S. 314, 321, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987) ("By 'final,' we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied.")

The same as Metcalf, Williams did not receive the "fair warning ... in language that the common world will understand." *McBoyle v. United States*, 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931); *see also Bouie v. City of Columbia*, 378 U.S. 347, 351, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964) ("The ... principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." (citation omitted)). Because Metcalf was the first person to assert the Montana GFSZA licensure provision does not mean the same reasoning cannot apply

to others, like Williams, who had a Montana license that they believed complied with the GFSZA. Uniqueness stems include the circumstances of the offense and the legal landscape from which it arises. Montana's legislative response to the GFSZA necessitates lenity and the presumption that Williams did not receive fair notice that he was out of compliance with the corresponding GFSZA. *Metcalf*, 156 F.4th at 885. Without fair notice, Williams' conviction under 18 USC §922(q) should be dismissed.

**B. The Gun Free School Zones Act too broadly prohibited and punished Ryan Williams from entering the 1000-foot buffer school zones with his lawfully possessed firearm leading to arbitrary enforcement of his individual right to possess firearms under the Second Amendment.**

If this Court says *Metcalf* is no longer applicable to other lawful gun owners in Montana and rejects constitutional avoidance principal, then it must consider the Second Amendment question. The GFSZA is susceptible to at least two plausible interpretations. Williams' conviction "raise[s] serious constitutional problems," or at least "serious questions," under the Second Amendment. *Metcalf*, 156 F.4th at 882.

**1. The constitutional right to individual firearms possession.**

The Second Amendment guarantees that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "We start ... with a strong presumption that the Second Amendment right ... belongs to all Americans." *Heller*, 554 U.S. at 580-81. All Americans extends beyond "responsible" citizens. *United States v. Rahimi*, 602 U.S. 680, 701, 144 S. Ct. 1889, 1903, 219 L. Ed. 2d 351 (2024).

Although the right to bear arms is vital to ordered liberty, this right is not "unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

In *Heller*, the District of Columbia enacted a law criminalizing the carrying of any unregistered firearm within the District while simultaneously prohibiting the registration of handguns, effectively banning them. *Heller*, 554 U.S. at 574. Additionally, any lawfully owned firearm (i.e., registered long gun) possessed within the District of Columbia was required to be "unloaded and dissembled or bound by a trigger lock or similar device" unless located in a place of business or being used for lawful recreational activities. *Id*. The United States Supreme Court considered "whether [the District's] prohibition on the possession of usable handguns in the home violates the Second Amendment to the Constitution". *Id*. at 573. The Court not only found that the prohibition was unconstitutional, it declared that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller* at 635.

The Court struck down the law's complete ban on handguns because the complete prohibition on handguns was constitutionally "invalid" for any purpose. Important to Williams' case, the also Court struck down the restriction against keeping functional firearms in the home because the requirement that any firearm in the home be rendered and kept inoperable at all times "makes it impossible for citizens to use

them for the core lawful purpose of self-defense and is hence unconstitutional." *Id.*, at 630. 2127. Section 922(q) contains ban that for all practical purposes to the one flatly struck down in *Heller* when applied to firearms stored inside the home. Section 922(q)(2)(B)(iii) prevented Williams from taking his loaded firearm in his car when he drove through the 1000-foot school zone buffer and further required that he keep the gun in a locked container within the vehicle.

**2. The Bruen historical analysis.**

While *Heller* established the right to keep a useable firearm in one's home for the purpose of self-defense, the Court more recently found that the Second Amendment protects the right to armed self-defense in public. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 19, 31-33 (2022). The command under *Bruen* is to determine whether the Second Amendment's plain text covers an individual's conduct. If yes, then the Constitution presumptively protects that conduct. The next step then is for the government to justify the regulation as "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17, *see also Teter v. Lopez*, 125 F.4th 1301, 1305 (9th Cir. 2025).

Under step one of the *Bruen* analysis, it is undisputed that Williams is part of "the people" who have Second Amendment rights. United States v. *Stennerson*, 150 F.4th 1276, 1288 (9th Cir. 2025). He was a U.S. citizen who owned and ran a business on his property that he needed to protect. Moreover, gay individuals like Williams'

experience victimization at a rate more than twice that of straight individuals.[8] Williams had no other disqualifying factors that would prevent him from exercising his right to carry a firearm for the protection of his home and self. The prohibition against possessing guns within 1000 feet of a school and excluding him from the recognized exceptions implicated his right to keep and bear arms. *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 117 (9th Cir. 2024), *cert. denied sub nom. B&L Prods. v. Newsom*, 145 S. Ct. 1958, 221 L. Ed. 2d 738 (2025) ("The plain text of the Second Amendment directly protects one thing—the right to "keep and bear" firearms.")

Under step two of the *Bruen* analysis, the Government must justify the application of its regulation by showing that disarming Williams in the school buffer zone is consistent with the nation's "historical tradition of firearm regulation." *Rahimi*, 602 U.S. at 691, (*quoting Bruen*, 597 U.S. at 17, 24). At essence, "the [G]overnment must demonstrate that firearms regulations are consistent with this Nation's historical tradition of firearm regulation," as the statute is applied to the defendant. *United States v. Allam*, 140 F.4th 289, 295 (5th Cir. 2025) *citing Bruen*, 597 U.S. at 17. The historical analysis confirms that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." *Bruen*, 597

[8] Jennifer L. Truman, Ph.D., and Rachel E. Morgan, Ph.D., Violent Victimization by Sexual Orientation and Gender Identity, 2017–2020, U.S. DOJ Bureau of Justice Statistics, NCJ304277 (June 2022).

U.S. at 30. Indeed, sensitive places are intended to be the rare *exception* to the general right to public carry. Using the historical record, the *Bruen* Court acknowledged only three types of places where it suspected firearm carry might presumptively be foreclosed: legislative assemblies, polling places, and courthouses. *Id.* at 31 (*citing* David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36, 244-47 (2018)).

Both *Heller* and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) describe sensitive places where carry may be prohibited using the preposition "in," not "near" or "around." In *Wolford v. Lopez,* 609 U.S. 185, 146 S. Ct. 2032, 225 L. Ed. 2d 494 (2026), the United States Supreme Court considered designating parking lots, like the one Williams was a half a block away from when he stopped the student, as sensitive places. The Court provided a hypothetical about how difficult it would be to comply with the Hawaii regulation under consideration:

> Imagine what our hypothetical young woman will have to do when she drives to the supermarket after work. When she arrives, she will violate the literal terms of the Hawaii law merely by pulling into the parking lot while having her handgun concealed on her person. She can minimize the length of her violation by disarming as soon as she arrives. But in removing the handgun from her person, she must take care not to let anyone see it for even a moment. Otherwise, she could be charged with "recklessly caus[ing] alarm to another person by failing to conceal the firearm, even briefly." Haw. Rev. Stat. § 134–9.7. Once she has removed the handgun from her person, she cannot leave it in her car without locking it in what amounts to a safe. See § 134–9.3.

///

*Id.* at 203. The Court held that the Hawaii law severely hampered the ability of law-abiding citizens to exercise their Second Amendment rights. *Id.* at 204.

Wolford is more on point than the reference to 19th-century polling place buffer zone laws the district court cited. The polling restrictions are not relevantly similar to the school zone restriction of §922(q)(2)(A) in terms of the burden they impose on the exercise of the right. The polling place buffer zones would only apply on election days, totaling no more than two-to-three days maximum each year depending on how many federal, state, local, and primary elections occurred. By contrast, the school zone laws apply all day, every day of the year, regardless of the presence of children or staff, including when school is not in session and when the school year has concluded. Section 922(q)(2)(A) is in effect *every day*, making 1,000 feet around each school off-limits to a constitutional right on a permanent basis. *Rahimi* further confirms the that temporal burdens imposed by the historical laws are more acceptable when the gun-right restriction has an end point. "[L]ike surety bonds of limited duration, Section 922(g)(8)'s restriction was temporary as applied to Rahimi. Section 922(g)(8) only prohibits firearm possession so long as the defendant 'is' subject to a restraining order." *Rahimi*, 144 S. Ct. at 1902. For someone like Williams who was licensed to carry a firearm with no permit required, this school buffer zone puts him in constant risk of committing a crime every time he leaves his home with a firearm. *See Wolford*,

609 U.S. at 204.

### 3. As-applied constitutional challenges to firearms restrictions must consider the individual circumstances.

An as-applied challenge "does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (*quoting United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010)); *see Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329, 126 S. Ct. 961, 968, 163 L. Ed. 2d 812 (2006) ("It is axiomatic that a statute may be invalid as applied to one state of facts and yet valid as applied to another."). In the gun regulation context, an as-applied challenge is "a narrower consideration" than weighing a facial attack, *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) Courts "go beyond the language of the [statute]" and analyze its "application to the particular circumstances of an individual." *Freedom Path, Inc. v. Internal Revenue Serv.*, 913 F.3d 503, 508 (5th Cir. 2019).

As gun regulation cases continue to be litigated, the facts clearly matter. *Compare, United States v. Duarte*, 137 F.4th 743, 748-49 (9th Cir. 2025) (*en banc*) (18 U.S.C. §922(g)(1) found to be constitutional as applied to a defendant with five prior non-violent felonies) *with Range v. Att'y Gen. United States*, 124 F.4th 218, 232 (3rd Cir. 2024) (*en banc*) (federal government failed to provide a historical

analogue justifying the permanent disarmament of someone who two decades after he was convicted of food-stamp fraud and completed his sentence, he sought protection from prosecution under 18 U.S.C. §922(g)(1)). When the Fourth Circuit considered the application of the GFSZA, it noted that concrete facts properly underlie an as-applied challenge to a statute. *Allam*, 140 F.4th at 295.

Similar to *Heller* and *Wolford*, the 1,000-foot school zone buffer prohibition requires an armed citizen entering a school zone to unload their firearm and have it in a locked container or locked firearms rack in a motor vehicle. 18 U.S.C. §922(q)(2)(B)(iii). Given that the East Helena High School's 1,000-foot school zone buffer encompasses a major thoroughfare, the locking and storage requirement is almost never enforced. A statute that fails to give adequate notice to people of ordinary intelligence of what *conduct* is prohibited invites arbitrary and discriminatory enforcement. *United States v. Hungerford*, 465 F.3d 1113, 1117 (9th Cir. 2006). For Williams, the 1,000-foot buffer zone means he cannot leave his home and business with an operable firearm to protect himself. Given his unique circumstances, the application of 18 U.S.C. §922(q)(2)(B)(iii)(I) and (II), violates his constitutional right to keep and bear arms.

## IX. CONCLUSION

If constitutional avoidance principals are applied, Williams was in a position where he plausibly relied on the Montana licensing statute and was not given fair

notice that he could not take his firearm within the 1000-foot buffer zone surrounding East Helena High School. Therefore, just as in *Metcalf*, his conviction should be reversed and remanded with instructions to dismiss the indictment.

Fully addressing the Second Amendment question as applied to Williams, 18 U.S.C. §922(q)(2)(B)(iii)(I) and (II), violates his constitutional right to keep and bear arms because he cannot freely travel from his home and business with an operable firearm. Therefore, his conviction should be dismissed because it is unconstitutional.

RESPECTFULLY SUBMITTED this 1st day of October, 2026.

/s/ Chad Wright
CHAD WRIGHT
Assistant Federal Defender
Counsel for Defendant-Appellant

## X. STATEMENT OF RELATED CASES

The undersigned, counsel of record for the Defendant-Appellant, pursuant to Rule 28-2.6 of the Rules of the United States Court of Appeals for the Ninth Circuit, states that, to his knowledge, there are no related cases pending in this Court.

DATED this 1st day of October, 2026.

/s/ Chad Wright
CHAD WRIGHT
Assistant Federal Defender
Counsel for Defendant-Appellant

## XI. CERTIFICATE OF COMPLIANCE

I hereby certify that this Opening Brief of Defendant-Appellant is in compliance with Ninth Circuit Rule 32(a). The Brief's line spacing is double-spaced. The brief is proportionately spaced, the body of the argument has a Times New Roman typeface, 14-point size and contains less than 14,000 words at an average of 280 words (or less) per page, including footnotes and quotations. (Total number of words: 6,205 excluding tables and certificates).

DATED this 1st day of October, 2026.

/s/ Chad Wright
CHAD WRIGHT
Assistant Federal Defender
Counsel for Defendant-Appellant

## XII. CERTIFICATE OF SERVICE
## Fed.R.App.P. 25

I hereby certify that on October 1, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system.

Participants in the case who are registered ACMS users will be served by the appellate ACMS system.

I further certify that some of the participants in the case are not registered ACMS users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party carrier for delivery within 3 calendar days, to the following non-ACMS participants:

RYAN CHRISTOPHER WILLIAMS
2725 Bandera Dr
East Helena, MT
Defendant-Appellant

/s/ Chad Wright
CHAD WRIGHT
Assistant Federal Defender
Counsel for Defendant-Appellant